IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WATERKEEPER ALLIANCE, INC.   *
                                     *
v.                                  *
                                     *    Civil Action No. WMN-10-487
ALAN HUDSON et al.        *
                                     *
* * * * * * * * * * * * * * *

**MEMORANDUM AND ORDER**

Before the Court are motions for attorneys' fees filed by Defendant Perdue Farms, Inc. (Perdue), ECF Nos. 212, 223, and Defendant Alan Hudson, ECF Nos. 215, 222. The motions are fully briefed and a hearing was held on these motions on June 26, 2013. Upon review of the briefs submitted by the parties, the oral argument, and the applicable case law, the Court determines that the motions should be denied.

This case was brought under the citizen suit provision of the Clean Water Act (CWA), 33 U.S.C. § 1365. The Court assumes the reader's familiarity with the extensive findings of fact previously presented by the Court, see ECF No. 211, and that factual background will not be repeated here in any significant detail. Briefly stated, however, Plaintiff alleged that the poultry operation on Defendant Hudson's family farm was responsible for the release of high levels of pollutants into a tributary of the Pocomoke River. At all times relevant, Hudson

was using his poultry operation to raise Cornish hens for Defendant Perdue.

After a ten day bench trial and significant post-trial briefing, the Court issued its Findings of Fact and Conclusions of Law on December 20, 2012.  Id.  The Court concluded that, while alarmingly high levels of fecal coliform, E. coli, nitrogen, and phosphorous had been discharged from Hudson's farm and that at least some of those contaminants would reach the Pocomoke River, Plaintiff had not met its burden of establishing that the poultry operation contributed to these discharges. Instead, the Court found that the only proven source of the observed discharges was the tons of cow manure associated with the beef cattle operation that Hudson also conducted on his farm.  As the result of the way in which Plaintiff elected to pursue this action, Plaintiff's CWA claim was restricted to pollution allegedly caused by the poultry operation.  Therefore, the Court entered judgment in favor of Defendants.

As the prevailing parties, Defendants have moved for recovery of the attorneys' fees and costs expended to defend this action from March 1, 2012, the date this Court denied cross motions for summary judgment, through the preparation for and conduct of trial.  By an order dated January 28, 2013, the Court bifurcated the issue of Defendants' entitlement to any fees from the resolution of the amount of any fees.  While the pending

motions are limited to the entitlement issue, the Court is aware that Defendants collectively seek approximately three million dollars in attorneys' fees and costs.

In addressing these motions, the Court must first determine the standard to be applied to the award of fees to prevailing defendants in CWA actions. The CWA provides that "[t]he court, in issuing any final order in any [citizen suit] . . . , may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). Although this provision makes no distinction between prevailing plaintiffs and prevailing defendants, most courts that have reached the issue have applied different standards based upon the identity of the prevailing party. "When a plaintiff prevails, the section is liberally construed and fees are typically awarded." Sierra Club v. Cripple Creek and Victor Gold Mining Co., 509 F. Supp. 2d 943, 949-50 (D. Colo. 2006) (citing Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 416-17 (1978) and Browder v. City of Moab, 427 F.3d 717, 721 (10th Cir. 2005)). Courts reason that fees should typically be awarded to a prevailing plaintiff because "'the plaintiff is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority,' and when the plaintiff prevails, he or she has proven

3

that the defendant is a 'violator of federal law.'" Id. at 950 (quoting Christiansburg Garment, 434 U.S. at 418).

When a defendant prevails, however, courts look to different equitable considerations to determine whether fees should be awarded. In this context, courts are concerned that plaintiffs with legitimate, but not airtight, claims might be discouraged from pursuing such claims if faced with the potential threat of fee shifting. Accordingly, most courts that have reached the issue have applied the same standard to CWA cases that is used by courts to determine whether fees should be awarded to prevailing defendants in civil rights cases, i.e., the standard announced by the Supreme Court in Christiansburg Garment. Under that standard, to obtain the award of fees, a prevailing defendant must show that the civil action was "frivolous, unreasonable, or without foundation," or that the plaintiff continued to litigate "after it clearly became so." Sierra Club, 509 F. Supp. 2d at 950 (citing Christiansburg Garment, 434 U.S. at 419-20).

As Perdue acknowledges in its briefing, the Supreme Court has held that fee-shifting provisions in environmental laws should be applied "in a similar manner" as those of the civil rights laws. ECF No. 223 at 7 n.6 (citing Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 559-60 (1986) and City of Burlington v. Dague, 505 U.S. 557, 561-62 (1992)).

Defendants note, correctly, that these environmental cases from the Supreme Court addressed fees for prevailing plaintiffs, not prevailing defendants, and that the Supreme Court has not spoken directly to the issue of when prevailing defendants should be awarded fees. Some circuit courts, however, have addressed fee awards for prevailing defendants and, those that have, have generally followed the Christiansburg Garment standard. See, e.g., Morris Smith v. Moulton Niguel Water Dist., 234 F.3d 1277, at *3 (9th Cir. 2000); Razore v. Tulalip Tribes of Washington, 66 F.3d 236, 240 (9th Cir. 1995); Sierra Club v. City of Little Rock, 351 F.3d 840, 847 (8th Cir. 2003).[1] While the Fourth Circuit has not directly addressed the issue, it has affirmed a district court's application of the Christiansburg Garment standard to the denial of attorneys' fees to a prevailing defendant in a CWA action, "credit[ing] the reasons given by the district court in reaching its conclusion." Deerfield Plantation Phase II-B Prop. Owners Ass'n, Inc. v. U.S. Army Corps of Eng'rs 501 F. App'x 268, 275 (4th Cir. 2012).

---

[1] Perdue cites a Fifth Circuit decision, Sierra Club v. Shell Oil Co., 817 F.2d 1169, 1176 (5th Cir. 1987), for the proposition that there is no higher standard for the award of fees to prevailing defendants than to prevailing plaintiffs. In that decision, The Fifth Circuit simply affirmed the district court's award of attorneys' fees in one sentence upon a finding of no abuse of discretion without any discussion of the standard guiding that discretion. Thus, the decision is of little precedential value.

Despite the lack of definitive guidance, there is no question in this Court's view that the Christiansburg Garment standard applies to any award of attorneys' fees under the CWA and, thus, to be entitled to fees, a prevailing defendant must show that the action was "frivolous, unreasonable, or without foundation," or that the plaintiff continued to litigate "after it clearly became so."  Like the fee provision in the CWA, the fee provision in the civil rights statute interpreted in Christiansburg Garment makes no distinction between prevailing plaintiffs and prevailing defendants and yet the Supreme Court fashioned different standards to apply to the different parties. This Court finds the reasoning behind that distinction even more compelling in the context of the CWA, where, unlike the civil rights actions, the plaintiff in a CWA action seeks no monetary relief for itself, but only acts to protect the public interest (or, at least, its perception of the public interest).

While Defendants do not concede the validity of Plaintiff's CWA claim at any stage of this action, their primary argument in favor of the award of fees is that the Court's March 1, 2012, Letter Order denying the cross motions for summary judgment, ECF No. 143, "put Plaintiff on notice both that its claim was fatally flawed and that the Court could assess fees in favor of Defendants if Plaintiff proceeded with a meritless case."  ECF No. 235 at 9.  The Court's Letter Order did raise concerns about

6

Plaintiff's shifting positions taken in this litigation and also noted potential weaknesses in the opinions proffered by Plaintiff's expert, Dr. Bruce Bell. Specifically, the Court questioned Dr. Bell's efforts to minimize the contribution of the cattle operation to the observed discharges while, at the same time, maximizing the "pathways" by which poultry waste could leave Hudson's farm. The Court also noted that it was clearly Plaintiff's desire to impose liability arising, not just from any CWA violation, but from a violation caused by a poultry operation associated with a major poultry integrator.

Despite the concerns expressed in the Letter Order regarding Dr. Bell's opinions, the Court did not strike Dr. Bell as an expert witness, finding his opinions were "generally consistent throughout this litigation." ECF No. 143 at 1. While the Court expressed skepticism of Dr. Bell's efforts to minimize the contribution of the cattle operation to the discharges, it is important to note that, in order to prevail on its CWA claim, Plaintiff did not need to prove that the poultry operation was the only source contributing to the discharges from Hudson's farm or even that the poultry operation was the major source of contribution. Plaintiff only needed to establish that Hudson's chickens contributed in some way to the high levels of pollutants coming off the farm and ultimately entering the Pocomoke River. Recognizing that this was all that

7

Plaintiff needed to establish, the Court denied Defendants' motions for summary judgment.

The Court did note in its Letter Order, as Defendants highlight, that, "it is not unprecedented that attorney's fees can be awarded to a prevailing defendant in a CWA citizen suit" "[s]hould the Court find no violation [of the CWA]." Id. (citing Cripple Creek, 509 F. Supp. 2d at 951). But, the Court noted, such awards are "certainly rare." Id. Furthermore, just above the observation about the possible award of fees should Defendants prevail, the Court suggested what the possible result might be "[s]hould the Court find a CWA violation," noting that certain factors might limit any fine that the Court might impose. Id. (citing 33 U.S.C. § 1319(d)). Thus, although a fair reading of the Letter Order would have made it clear that the Court believed that the vast majority of the contaminants coming off Hudson's farm were coming from Hudson's cows, the Court did not foreclose the possibility that Plaintiff might be able to prove that some amount, however small in comparison, came from Hudson's chicken houses.

In support of their motions for attorneys' fees, Defendants also point to language in the Court's Findings of Fact and Conclusions of Law that they believe reflect the Court's view that Plaintiff's claims were without foundation. See ECF No. 223 at 14. The Court was highly critical of certain aspects of

this litigation. The Court opined that it "borders on indefensible" that Plaintiff did not conduct the straightforward testing that would have isolated the contribution of contaminates from the poultry operation from those of the cattle operation and that it was "somewhat astonishing" that Plaintiff would explain that failure by suggesting that to do so would have been too expensive. ECF No. 211 at 25. In a similar vein, after underscoring the important role that CWA citizen suits play in protecting the nation's water resources, the Court expressed its dismay that, in this instance, Plaintiff did not perform this role "responsibly and effectively." ECF No. 211 at 49.

These criticisms, however, were directed not to the merits of Plaintiff's claim but to the manner in which Plaintiff went about attempting to prove those merits, specifically, the lack of sufficient and appropriate sampling and testing. The Court focused on Plaintiff's failure to take water samples from a point in Ditch One between the Swale and Ditch 3 that would have isolated the contribution of the chickens from the contribution of the cows. Id. at 24. The Court also questioned why Plaintiff did not take the obvious step of sampling the "dust" emitted from the chicken house exhaust fans. Id. at 25-26. While criticizing these failures, the Court acknowledged in its Findings of Fact and Conclusions of Law that it was certainly

9

possible that some of the discharged contaminants came from the poultry operation and "[i]t is also possible that, if Plaintiff had done appropriate testing on the Hudson Farm, they could have found evidence of that discharge." Id. at 42 (emphasis in original). The Court further opined that it "could readily envision" finding a violation caused by the poultry operation if Plaintiff had conducted adequate testing. Id. at 44.

One is left to ponder why Plaintiff failed to conduct the testing that, at least in hindsight, seems so obviously necessary and critical to the proof of its claim. One possibility, of course, is that Plaintiff did not sample or test because it feared that the appropriate testing would disprove its claim. Were that the case, the award of fees would be justified. Another possibility, however, is that Plaintiff simply overestimated the strength of its case and saw no need for additional testing. The Court believes that this is the more likely explanation and that this kind of tactical misjudgment does not support the award of attorneys' fees.

In addition to concerns about Plaintiff's failure to conduct adequate sampling and testing, the Court's decision on the merits turned on the relative credibility and persuasiveness of Plaintiff's expert, Dr. Bell, and Defendants' expert, Dr. Charles Hagedorn. As mentioned during the closing arguments, the Court found that both experts "made a sincere effort to

formulate opinions that each believe to be valid." Nov. 30, 2013 Tr. at 4. The Court found validity in some aspects of Bell's testimony. The Court agreed with Dr. Bell that there was a clear hydrological connection between the ditches on Hudson's farm and the Pocomoke River. ECF No. 211 at 34. The Court discounted some aspects of Dr. Hagedorn's testimony, specifically, the level to which the water table must rise before surface water runoff would occur. Id. at 31.

While crediting and discrediting to some extent the testimony of both experts, the Court ultimately found Dr. Hagedorn's expertise "more closely aligned" with the most critical issues and his opinions on those issues to be more compelling. Id. at 28. In opposing the motions for fees, Plaintiff argues that it could not have foreseen that the Court would give more weight to Dr. Hagedorn because it was events at trial, specifically, the cross examination of Dr. Bell and the introduction by Dr. Hagedorn of "new opinions," that altered the comparative weight given to the experts' testimony. Defendants were effective in cross examining Dr. Bell, particularly on his analysis of the topography of Hudson's farm. Id. at 27. Although the Court does not agree that Dr. Hagedorn's opinions were "new," his presentation at trial made his conclusions perhaps more compelling than would have been apparent at the

summary judgment stage. While not vastly different, Defendants' case was stronger at trial than at summary judgment.

As a result, we have a judgment that turned, at least in part, on the Court's assessment of the credibility of opposing experts. To a greater degree, the judgment turned on Plaintiff's failure to properly prepare its case by conducting the necessary sampling. In this Court's view, Plaintiff's claim was not pursued or litigated as well as it could have been. That, however, is not the same as concluding that the underlying claim itself was "frivolous, unreasonable, or without foundation," or ever clearly became so. Thus, the Court concludes that the award of attorneys' fees is not warranted in this instance.

There are a few remaining issues that were discussed at some length in the parties' briefing and, while not determinative of the attorneys' fees issue, warrant brief comment.

Defendants are critical of Plaintiff's predetermined goal to bring a CWA suit against a poultry farm that was under contract with a major poultry integrator. See ECF No. 223 at 1-2. There is no denying that this was Plaintiff's goal. There is also no denying, however, that large scale poultry operations on Maryland's Eastern Shore have a potential impact on the water quality of the Chesapeake Bay. For an environmental group to

target its efforts on what it perceives as a major source of pollution is not unusual, nor unreasonable, nor a sign of bad faith. If done well, it could function as an effective use of that organization's resources.

The Court referred to Plaintiff's quest to go after a major poultry integrator in both its March 1, 2012, Letter Order, ECF No. 143 at 3, and its Findings of Fact and Conclusions of Law, ECF No. 211 at 6-7, 9-10, 44-46. These references were made, not to indicate that there was any impropriety in the strategic choice to attempt to impose liability on a poultry integrator, but instead, to comment on Plaintiff's willingness to make misrepresentations to the public concerning this litigation and on what appeared to be Plaintiff's effort to somehow make Perdue responsible for Hudson's cattle. See id.

Various misrepresentations made by Plaintiff and Plaintiff's agents to the press and public are also highlighted in Defendants' motions for attorneys' fees. Defendants present transcripts of interviews and other statements wherein Plaintiff continues to attempt to "spin" the results of these proceedings to its advantage. Perhaps most distressing are statements made by one of Plaintiff's attorneys, Scott Edwards,[2] implying that

---

[2] On the day following the filing of Perdue's motions reporting these misstatements, Plaintiff filed a motion to withdraw the appearance of Mr. Edwards. ECF No. 227. Plaintiff also filed a

13

the case was lost because Plaintiff was not given access to Hudson's farm, as well as other misrepresentations made by Edwards regarding the facts and law related to this case. As counsel of record, Mr. Edwards should have been aware that Plaintiff was given access to Hudson's farm on the two occasions that it requested access and that Plaintiff never sought permission to do any further testing. He is also aware that access could have readily been ordered by the Court had such a request been denied by Hudson.

As disconcerting as these extra-judicial public statements might be, the Court does not view them as grounds to find that the claim that Plaintiff brought in these proceedings was frivolous, unreasonable, or without foundation. While these out of court statements may serve to diminish Plaintiff's credibility with the public and ultimately, its effectiveness as an advocate for its chosen causes, they are not a basis on which to award attorneys' fees.

Defendants raise one additional issue concerning Plaintiff's conduct in this litigation - the manner in which Plaintiff participated in the settlement procedures after the March 1, 2012, Letter Order was issued. At the Court's suggestion, the parties met with then Magistrate Judge Paul W.

---

motion to withdraw the appearance of Christopher Nidel. ECF No. 228. Both motions will be granted.

Grimm to discuss a possible settlement of this litigation. Typically, the trial judge would not be aware of positions taken by the parties in settlement negotiations and a party's "good faith" or "bad faith" in settlement should not be considered in determining if attorneys' fees are to be awarded. See <u>Cripple Creek</u>, 509 F. Supp. 2d at 950 and n.16 (noting that subjective bad faith is not the determinative factor but might be a stronger basis for an award of fees if the case was also frivolous, unreasonable, or groundless, citing <u>Christiansburg Garment</u>, 434 U.S. at 422).

    Here, however, Plaintiff opened the door to some examination of its settlement conduct by asserting in its opposition to Defendants' motions that, after the issuance of the Letter Order, it made a "good faith" effort to resolve this matter without the need for a trial. Defendants challenged that representation of good faith and the Court requested, and the parties submitted, copies of the demands and counter-demands exchanged between the parties and submitted to Judge Grimm. At oral argument, the parties also discussed the course of the settlement discussions.

    A review of the submitted documents indicates that Plaintiff was not seriously working to settle this matter. Plaintiff continued to press for more relief than it would or could have obtained from a decision in its favor on the merits.

The Court notes that, in the course of negotiations, Perdue proposed a joint contribution with Plaintiff, albeit modest, to an educational institution to study an agriculture-related environmental issue.  It is disappointing that no agreement that could have actually benefitted the Chesapeake Bay came from these negotiations.  The Court also finds it ironic that one item of relief sought by Plaintiff in its settlement demands was the re-start of the Perdue-EPA Clean Waters Initiative, a program that appears to have been discontinued as a result of this litigation and Plaintiff's efforts to use that initiative to impose liability on Perdue.

It is most unfortunate that so much time and so many resources were expended on this action that accomplished so little.[3]  Nevertheless, the Court cannot find that Defendants' request for the award of attorneys' fees satisfies the applicable standard for the award of such fees.

Accordingly, IT IS this 27th day of August, 2013, by the United States District Court for the District of Maryland,
ORDERED:

1) That the Motion to Withdraw Appearance of Scott Edwards for Plaintiff, ECF No. 227, is GRANTED;

---

[3] There is perhaps some solace in the fact that the party most emotionally impacted by this litigation, Mr. Hudson, at least had his litigation expenses covered from other sources.

2) That the Motion to Withdraw Appearance of Christopher Nidel for Plaintiff, ECF No. 228, is GRANTED;

3) That Defendant Perdue Farms, Inc.'s Motion for Attorneys' Fees, ECF No. 212, is DENIED;

4) That Defendant Alan Hudson's Motion for Attorneys' Fees, ECF No. 215, is DENIED; and

5) That the Clerk of the Court shall transmit a copy of this Memorandum and Order to all counsel of record.

```
              _____/s/_____
              William M. Nickerson
              Senior United States District Judge
```